UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MADISON BOARD OF EDUCATION, Plaintiff, v. S.S. and D.S. o/b/o R.S., Defendants. | Civil Action No. 19-14090 (MAH) OPINION |

## I.  INTRODUCTION

In this civil action arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 to 1482, Plaintiff Madison Board of Education ("Plaintiff" or "the District") seeks relief from an Administrative Law Judge's Order requiring Plaintiff to reimburse Defendants S.S. and D.S. for the costs associated with their child R.S.'s placement at SEARCH Learning Group, "a center-based applied behavior analysis provider."   Compl. ¶ 3, June 20, 2019, D.E. 1. This matter comes before the Court by way of the parties' cross-motions for summary judgment. The Court held oral argument on August 28, 2020.  For the reasons that follow, Defendants' motion is granted, and Plaintiff's motion is denied.

## II.  BACKGROUND[1]

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services

---

[1]   The Court recounts the basic factual overview of this matter from the parties' respective Statements of Undisputed Facts.  *See* Pl.'s Rule 56.1 Statement of Undisputed Facts ("Pl.'s SOF"), May 27, 2020, D.E. 22-2; Defs.' Rule 56.1 Statement of Undisputed Facts ("Defs.' SOF"), May 27, 2020, D.E. 21.  The Administrative Law Judge's relevant factual findings are recited in connection with the two issues on appeal.  *See generally S.S. v. Madison Bd. of Educ.*, N.J. Admin. No. EDS 03514-17 ("ALJ Decision").

designed to meet their unique needs . . . ."   20 U.S.C. § 1400(d)(1)(A).   "The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'— more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017) (quoting 20 U.S.C. § 1412(a)(1)(A)). "[A] FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction.   *Id.* at 748-49 (quoting 20 U.S.C. §§ 1401(9), (26), (29)).   "Under the IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE."   *Id.* at 749 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).   "If parents believe that an IEP fails to provide their child with a FAPE, they may seek an administrative 'impartial due process hearing.'" *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (quoting 20 U.S.C. § 1415(f)).   If the school district is unable to provide a FAPE, parents may unilaterally place their child at a private institution and seek reimbursement. *See id.*

R.S., Defendants' son, has been diagnosed with autism, and is eligible for special education and related services from Plaintiff under the classification of preschool child with a disability. *See* Pl.'s SOF ¶¶ 1, 9; Defs.' SOF ¶¶ 3, 28, 33.   On March 30, 2016, when R.S. was about two-and-a-half years old, Defendants enrolled him at SEARCH Learning Group ("SEARCH") for the purpose of providing him with "intensive full-time services based on the Science and Principles of Applied Behavior Analysis [("ABA")]."   Defs.' SOF ¶¶ 2; *see also* Pl.'s SOF ¶¶ 4, 19.

On November 1, 2016, Plaintiff proposed an IEP that offered a preschool disabled program classroom within the school district.   *See* Pl.'s SOF ¶ 11; Defs.' SOF ¶ 34.   Two weeks later, Defendants advised Plaintiff that they were rejecting the IEP and continuing R.S.'s placement at SEARCH.   *See* Pl.'s SOF ¶¶ 16, 18; Defs.' SOF ¶ 43.

2

On February 7, 2017, Defendants filed for a petition for due process with the New Jersey Department of Education, asserting that the proposed IEP was unsatisfactory and that they should be reimbursed for all costs associated with R.S.'s placement at SEARCH.   Pl.'s SOF ¶ 20; Defs.' SOF ¶ 7.   The matter was transferred to the Office of Administrative Law, and assigned to the Honorable Kelly J. Kirk, Administrative Law Judge ("ALJ").   Pl.'s SOF ¶¶ 22-23.   The District filed a motion for partial summary decision on whether R.S.'s private placement was eligible for reimbursement as a non-school entity.   *See id.* ¶ 24; Defs.' SOF ¶ 8.   The ALJ denied the motion, finding the issue to be a factual question tied up with the issue of whether Plaintiff provided R.S. a FAPE.   Pl.'s SOF ¶ 25; Defs.' SOF ¶ 10.

The matter proceeded to a hearing conducted over the course of six days between May 2018 and September 2018.   *See* Pl.'s SOF ¶ 27; Defs.' SOF ¶ 11.   The ALJ heard testimony from D.S.; Carrie Kahana, the founder of SEARCH; as well as various therapists and behaviorists.   *See* ALJ Decision at 3.   By way of a fifty-four-page decision dated March 22, 2019, the ALJ determined that the district had not provided R.S. with a FAPE, and ordered that Plaintiff reimburse Defendants for the cost of R.S.'s placement at SEARCH for the 2016-2017 school year.[2]   *See* ALJ Decision at 49, 54; Pl.'s SOF ¶ 37; Defs.' SOF ¶¶ 12-13.

The ALJ found that "[t]he credible testimony and the documentation from SEARCH reflect that SEARCH's ABA program was appropriate for R.S. and allowed him to make meaningful educational progress."   ALJ Decision at 49.   The ALJ rejected Plaintiff's "arguments that [Defendants] are barred from reimbursement because SEARCH is not accredited or approved by the State of New Jersey."   *Id.*   The ALJ noted that "a parental placement may be found to be

---

[2] The parties stipulated during the hearing that the due process petition "was limited to the 2016-2017 school year."   ALJ Decision at 53.   The ALJ accordingly made "no determination . . . as to whether the District's preschool disabled program would be appropriate or provide a FAPE for any other school year or for any other IEP."   *Id.*

appropriate by a court of competent jurisdiction or an [ALJ] . . . for placements in unapproved schools, even if it does not meet the standards that apply to the education provided by the district board of education." *Id.* at 49-50 (citing N.J. Admin. Code § 6A:14-2.10(b)).

On June 20, 2019, Plaintiff filed this civil action, appealing only the portion of the ALJ's decision ordering the reimbursement of costs associated with SEARCH. *See* Compl. ¶ 26 ("The present appeal does not seek to challenge the ALJ's determination regarding R.S.'s FAPE."). Plaintiff requests that this Court reverse the ALJ's Decision "as to Defendants' entitlement to full reimbursement for their out-of-district placement at SEARCH and their associated transportation expense from November 18, 2016 to the end of the 2016-2017 school year[.]" *Id.* ¶ 85. The parties have now cross-moved for summary judgment.[3]

## III.   DISCUSSION[4]

Plaintiff seeks to set aside the portion of the ALJ's Order requiring reimbursement of the costs associated R.S.'s placement at SEARCH on two grounds. According to Plaintiff, reimbursement is permitted only for "unilateral *school* placements—not full-time placements with center-based behavior service providers, as occurred here." Pl.'s Mem. of Law in Supp. of Mot. for Summary J. ("Pl.'s Moving Br.") at 1, May 27, 2020, D.E. 22-1 (emphasis in original). Second, Plaintiff contends that Defendants did not comply with the relevant notice requirements or act in an otherwise reasonable manner prior to the unilateral placement. *See id.* at 1-2. It submits that "the ALJ erred by failing to address Defendants' failure to satisfy notice requirements

---

[3] Shortly after the filing of this action, Defendants filed a Request for Enforcement with the New Jersey Department of Education pertaining to the ALJ's decision. Following the Department of Education's demand for documentation of compliance by September 20, 2020, Plaintiff moved for a stay of the Order awarding reimbursement to Defendants. On September 19, 2019, the Court denied the District's Motion for Stay. *See* Order, Sept. 19, 2019, D.E. 11.

[4] The parties have consented to the Undersigned's jurisdiction. *See* Notice, Consent, and Reference of Civil Action to Magistrate Judge, Jan. 15, 2020, D.E. 16.

as a precondition of reimbursement."   Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summary J. ("Pl.'s Opp'n Br.") at 5, June 24, 2020, D.E. 29.

Under the IDEA, "'[a]ny party aggrieved by the findings and decision' made in the administrative proceeding 'shall have the right to bring a civil action' in state or federal court." *Ridley Sch. Dist.*, 680 F.3d at 270 (quoting 20 U.S.C. § 1415(i)(2)(A)).   The Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."   20 U.S.C. § 14l5(i)(2)(C).

As a general matter, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).   The Court applies a different standard in IDEA cases.   *See Millburn Twp. Bd. of Educ. v. J.S.O.*, No. 13-1208, 2014 WL 3619979, at *3 (D.N.J. July 21, 2014).   "[W]hen there is no new evidence presented to the district court, as in this case, a motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record."   *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (internal quotation marks omitted), *aff'd*, 65 F. App'x 404 (3d Cir. 2003). "Such review, although denominated as a motion for summary judgment, is not an ordinary Rule 56 motion, but is more akin to an appeal."   *D.S. v. Parsippany Troy Hills Bd. of Educ.*, No. 17-9484, 2018 WL 6617959, at *9, n.11 (D.N.J. Dec. 18, 2018); *see also D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 769 (D.N.J. 2010) ("Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment

standard of 'no genuine issues of material fact.'" (quotation omitted)), *aff'd*, 489 F. App'x 564 (3d Cir. 2012).

"When considering a petition for review challenging a state administrative decision under the IDEA, a district court applies 'a nontraditional standard of review, sometimes referred to as modified de novo review.'"   *Ridley Sch. Dist.*, 680 F.3d at 268 (quoting *D.S. v. Bayonne Bd. of Educ.,* 602 F.3d 553, 564 (3d Cir. 2010)).   The Court gives "due weight" to the ALJ's findings. *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).   "Factual findings from the administrative proceedings are to be considered prima facie correct."   *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).   "[I]f a reviewing court fails to adhere to them, it is obliged to explain why."   *Id.* (alteration in original) (internal quotation marks omitted).   Questions of law are reviewed de novo.   *See P.N. v. Greco*, 282 F. Supp. 2d 221, 235 (D.N.J. 2003).

## 1. SEARCH is a Reimbursable Placement Option

The Court begins with Plaintiff's contention that the costs associated with R.S.'s placement at SEARCH are non-reimbursable because it is not a school.   Plaintiff contends that the ALJ misconstrued the crux of the parties' dispute—whether SEARCH, as an ABA service provider and "non-school entity," qualifies as a reimbursable placement.   Pl.'s Moving Br. at 7-8.   Plaintiff submits that SEARCH's "lack of DOE approval" and "lack of accreditation" are "immaterial to the issue under appeal."   *Id.* at 13.   According to Plaintiff, "the fact that SEARCH cannot meet the minimum criterion for reimbursement (*i.e.*, being a school) is what makes it inappropriate as a unilateral placement . . . ."   *Id.*   Plaintiff submits that both federal and state regulations prescribe that "only a school can constitute an appropriate placement eligible for reimbursement."   *See id.* at 8-10 (collecting cases and citing 34 C.F.R. § 300.148(c); N.J. Admin. Code § 6A:14- 2.10(b)).

Plaintiff also points to various administrative decisions that purportedly denied reimbursement for non-school entities.  *See id* at 13-18.

Relying on Kahana's testimony as well as representations on SEARCH's website, Plaintiff emphasizes that SEARCH "is not a preschool, an elementary school or an early childhood program as required by N.J.A.C. 6A:14-2.10(b)."  *Id.* at 11-12 (footnote omitted).  In Plaintiff's view, SEARCH "is more akin to a clinic or agency" that provides supplemental services to special education students enrolled in schools, "as opposed to an educational placement."  *Id.* at 12 (footnote omitted).  Plaintiff also asserts Defendants' decision to "contract[] with SEARCH directly to provide clinical ABA services as the entirety of R.S.'s educational program . . . is wholly inconsistent with the Legislature's intent in mandating that unilateral placements minimally occur in schools giving children access to an all-around education."  *Id.* at 13.  It explains that

> [r]eimbursement is not available for non-school placements because they lack the tangible elements that define an educational environment -- such as certified teachers and related services providers, and the ability to implement fully all aspects of an IEP -- as well as the benefits received by learning among other including non-disabled, students in a classroom environment.

*Id.* at 16; *see also* Pl.'s Opp'n Br. at 23 (stating that "it is the absence of school personnel . . . , related service offerings, and the ability to fully implement a child's IEP that makes SEARCH not a school").

The IDEA seeks to protect the rights of disabled children whose school districts cannot effectively educate them by requiring the district to "pay for their education elsewhere if they require specialized services that the public institution cannot provide."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) (*quoting P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)).  "A court may grant the family tuition reimbursement only if it finds that the school district failed to provide a FAPE and that the alternative private

placement was appropriate." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013).   The question here, as framed by Plaintiff, is whether SEARCH is appropriate for reimbursement under the Act.   The Court answers that question in the affirmative.

### a. The FAPE Requirement and Private Placements.

The statutory language and regulations promulgated by the respective federal and state agencies serve as the starting point in this analysis.   A FAPE is defined as

> special education and related services that . . . (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).   "Special education" is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including . . . (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education."   20 U.S.C. § 1401(29).   "Specially designed instruction" requires

> adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction . . . (i) [t]o address the unique needs of the child that result from the child's disability; and (ii) [t]o ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39.   "Related services" include

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation

> purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26); *see also* 34 C.F.R. § 300.34.

Part of the requirement that school districts provide disabled children with a FAPE is the mandate that those children are educated in the "[l]east restrictive environment."   20 U.S.C. § 1412(a)(5).   That means that,

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.115 (prescribing that "[e]ach public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services," which includes "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions").   That said, "[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program . . . must be at no cost to the parents of the child."   34 C.F.R. § 300.104.

A school district may also refer disabled students to "private schools and facilities" in accordance with a particular student's IEP.   20 U.S.C. § 1412(a)(10)(B)(i).   In the case of a referral, "the State educational agency shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies."   20 U.S.C. § 1412(a)(10)(B)(ii).

If the parents of a child with a disability "elect[] to place their child in [a] private school or facility" in the absence of referral, the agency is not required to pay for the cost of education "if that agency made a [FAPE] available to the child."   20 U.S.C. § 1412(a)(10)(C)(i).   Conversely, if the parents

> enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(10)(C)(ii).   Reimbursement for a parent's unilateral placement of his or her child "in a private preschool, elementary school, or secondary school" is contingent on the hearing officer's additional determination that "the private placement is appropriate."   34 C.F.R. § 300.148(c).   "A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the [State and local agencies]."   *Id.*

Subject to certain exceptions, the cost of reimbursement may be reduced or denied based on the parents' failure to state their concerns regarding the proposed placement and to timely declare their intent to enroll their child elsewhere.   *See* 20 U.S.C. § 1412(10)(C)(iii)(aa),(bb). The amount of reimbursement may also be reduced or denied "upon a judicial finding of unreasonableness with respect to the actions taken by the parent."   20 U.S.C. § 1412(10)(C)(iii)(III).

To recapitulate, in order to fulfill the statutory mandate to provide a FAPE to disabled children, school districts must offer (1) special education that involves "specially designed instruction" that is tailored to the unique needs of the child, and that may be conducted "in the home, in hospitals and institutions, and in other settings," 20 U.S.C. § 1401(29)(A); and (2) related

services that include, among other things, speech-language pathology services and occupational therapy, 20 U.S.C. § 1401(26)(A). The complement of services offered as part of an IEP must comply with State standards and, as a general matter, must be administered in the regular educational environment alongside non-disabled students to the extent practicable. *See* 20 U.S.C. § 1412(a)(5)(A). If "the nature or severity of the disability of the child is such that education in regular classes with the use of supplemental aids and services cannot be achieved satisfactorily," the school district may utilize "special classes" or "separate schooling," or recommend an alternative placement that removes the child from the traditional educational setting. *Id.* School districts may refer children to private facilities or private residential programs "as the means of carrying out the requirements of [the IDEA]," so long as "such . . . facilities meet the standards that apply to State educational agencies and local educational agencies." 20 U.S.C. § 1412(a)(10)(B); *see also* 34 C.F.R. § 300.104.

Congress thus recognizes that its goal of providing a FAPE to all children requires flexibility with respect to the educational setting. A child's particular needs may demand services that cannot be provided in the traditional school, and it is incumbent on public institutions in crafting that child's IEP to offer placement in an alternative facility—which need not be a school itself—should that be the least restrictive environment for that child. When the alternative placement comes on the recommendation of the public agency, the referral must be to a school or facility that complies with State mandates.

With respect to a private placement by the parents, the IDEA is in one sense narrower but in another sense less restrictive. The statutory language is unclear as to whether parents may avail themselves of the continuum of alternative placements that the school district may recommend when crafting the proposed IEP. A school district may determine that the provision of a FAPE requires home instruction, instruction in hospitals and institutions, or instruction in a

11

public or private residential program—so long as state educational guidelines are satisfied.   But

if the parents believe that their child is not receiving a FAPE—even where the IEP involves referral

to a private facility—it is unclear whether parents are limited to enrollment in a "private elementary

school or secondary school," even if said school need not be accredited or meet State standards.

20 U.S.C. § 1412(10)(C)(ii); *see also* 34 C.F.R. § 300.148(c) (extending private placement to

"private preschool").   Case law interpreting the IDEA has fortunately resolved this question.

### b.   The Court's Authority to Order Reimbursement.

Congress has explicitly authorized reviewing courts to "grant such relief as the court

determines is appropriate" during judicial review of a due process hearing decision.   20 U.S.C. §

1415(i)(2)(C)(iii).   In interpreting the foregoing language, the Supreme Court has explained:

> The ordinary meaning of these words confers broad discretion on
> the court. The type of relief is not further specified, except that it
> must be "appropriate." Absent other reference, the only possible
> interpretation is that the relief is to be "appropriate" in light of the
> purpose of the Act. As already noted, this is principally to provide
> handicapped children with "a [FAPE] which emphasizes special
> education and related services designed to meet their unique needs."

*Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass. ("Burlington")*, 471 U.S.

359, 369–70 (1985) (holding that the provision's grant of authority includes "the power to order

school authorities to reimburse parents for their expenditures if the court ultimately determines

that such placement, rather than a proposed IEP, is proper under the Act").

The Supreme Court subsequently rejected the argument that § 1412(a)(10)(C), which was

first included in the IDEA as part of the 1997 amendments to the statute, was intended to supersede

the Court's decision in *Burlington*.[5]   *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 241

---

[5] As part of the 1997 amendments, Congress renumbered the provision granting courts the authority to grant "appropriate" relief without substantively altering its text.   *See id.* at 239 (stating that the Court "will continue to read § 1415(i)(2)(C)(iii) to authorize the relief" set forth in *Burlington*).

(2009).   With respect to § 1412(a)(10)(C)(ii), the Court noted that "[b]ecause that clause is phrased permissively, stating only that courts 'may require' reimbursement in those circumstances, it does not foreclose reimbursement awards in other circumstances."   *Id.*   When the statute is viewed as a whole, the Court continued,

> [Section 1412(a)(10)(C)(ii)] is best read as elaborating on the general rule that courts may order reimbursement when a school district fails to provide a FAPE by listing factors that may affect a reimbursement award in the common situation in which a school district has provided a child with some special-education services and the child's parents believe those services are inadequate.

*Id.* at 242 (noting that the second clause, along with third and fourth clauses concerning limitations on reimbursement, "are premised on a history of cooperation and together encourage school districts and parents to continue to cooperate in developing and implementing an appropriate IEP before resorting to a unilateral private placement").   The Court concluded that "[t]he clauses of § 1412(a)(10)(C) are thus best read as elucidative rather than exhaustive."   *Id.* (citing *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) (noting that statutory language may "perfor[m] a significant function simply by clarifying" a provision's meaning)).

In this case, Plaintiff places significant emphasis on the applicable regulations' use of the term "school" in support of its argument that SEARCH, as an ABA service provider, does not qualify as a reimbursable placement.   *See* Pl.'s Br. at 18.   But in *R.L. v. Miami-Dade County School Board*, 757 F.3d 1173 (11th Cir. 2014), the United States Court of Appeals for the Eleventh Circuit rejected a nearly identical argument.   The Court finds that decision to be persuasive.

In *R.L.*, the child's mental and physical disabilities caused the child to experience digestive issues, muscle tics, and behavioral problems in crowded settings such as a public school.   *Id.* at 1178-79.   The symptoms grew worse as the child aged, which resulted in a medical leave during which time the school board "provided him with a couple hours of one-on-one home instruction

13

each day, which [the] parents supplemented at their own expense."  *Id.* at 1179.  Following his

return to school, the IEP team met to craft the child's IEP, which involved his enrollment in public

high school.  *Id.*  The child regressed, prompting the parents to withdraw him.  *Id.*  The parents

designed a "one-on-one instructional program" that "featured several hours of one-on-one

instruction along with Medicaid-covered speech and occupational therapy, services which [the]

IEP called for him to receive had he remained enrolled [in school]."  *Id.* at 1180.

The matter came before the Eleventh Circuit by way of challenges by both parties to certain

portions of the district court's decision, which included the court's decision to award

reimbursement for the home-based instruction and the speech and occupational therapy services.

*See id.* at 1181.  After concluding that the program was reasonably calculated to permit the child

to obtain some education benefit and that the Medicaid-covered services were reimbursable, the

Eleventh Circuit turned to the board's arguments that "District Courts do not have the power under

the IDEA to grant reimbursement for home-based instructional programs[.]"  *Id.* at 1184.

The Eleventh Circuit concluded that the board's argument "misses the mark."  *Id.* at 1185.

Pursuant to Section 1415(i)(2)(C)(iii)'s authority to grant appropriate relief, the panel concluded:

> It is clear to us that in some cases, reimbursement for one-on-one
> home instructional programs will be "appropriate" in light of the
> IDEA's purpose. The IDEA clearly contemplates that a state might
> be required to place a student in one-on-one homebound instruction
> to meet the student's needs, evidenced by its definition of "special
> education" to include "instruction conducted . . . in the home." 20
> U.S.C. § 1401(29); *see also* 34 C.F.R. § 300.115 (listing home
> instruction as part of the continuum of alternative placements states
> must make available to students to comply with the IDEA). We
> reject the suggestion that the IDEA might sometimes require the
> state to place a student in one-on-one homebound instruction, but
> prohibit a District Court from ever authorizing reimbursement for
> such a program. If we accept the Board's position, parents with a
> child who absolutely requires homebound instruction would be left
> without any remedy if they rejected an IEP offered by the state that
> placed the child in a normal public school. The IDEA does not
> countenance such a perverse result.

14

*Id.* The Eleventh Circuit also rejected the argument that Section 1412(a)(10)(C)(ii)'s reference to enrollment "in a private elementary school or secondary school" should be read to mean that "the IDEA . . . preclude[s] reimbursement for private non-school placements." *Id.* In accord with *Forest Grove*, the panel stated that "the specific reimbursement provisions outlined in § 1412(a)(10)(C)(ii) do not exhaustively describe the remedial powers granted by § 1415(i)(2)(C)," which "empower[] District Courts to craft whatever remedy is appropriate in any number of factual scenarios that might arise in an IDEA case, instead of just the one factual scenario addressed by § 1412(a)(10)(C)(ii)." *Id.* The Eleventh Circuit opined that reading that provision as authorizing reimbursement only for placement in private schools "would produce results 'bordering on the irrational.'" *Id.* at 1186 (quoting *Forest Grove*, 557 U.S. at 241).

The Court adopts the Eleventh Circuit's reasoning as its own, particularly in view of the Supreme Court's interpretation of § 1412(a)(10)(C)(ii). This Court's authority to grant appropriate relief pursuant to Section 1415(i)(2)(C) includes the right to order reimbursement for non-school placements because Section 1412(a)(10)(C)(ii)'s language is "elucidative rather than exhaustive." *Forest Grove*, 557 U.S. at 242. Accordingly, Plaintiff's argument that "[o]nly a school can constitute an appropriate, reimbursable placement" is unavailing.[6] Pl.'s Br. at 8.

### c. The Appropriateness of Defendants' Unilateral Placement of R.S. at SEARCH.

Although the Court has concluded that there is no *per se* statutory bar to SEARCH being a reimbursable placement, reimbursement may only be awarded only when "the student

---

[6] The Honorable Steve Mannion, U.S.M.J., recently reached the same conclusion with respect to whether SEARCH, as a non-school entity, is a reimbursable placement. *See Madison Bd. of Educ. v. S.V.*, No. 19-4755, 2020 WL 5055149, at *3-4 (D.N.J. Aug. 26, 2020) (noting that Plaintiff's argument concerning reimbursement for SEARCH "focus[es] on the literal use of the word 'school,' an approach that has been thoroughly rejected by the Supreme Court and numerous lower courts").

demonstrates that the private placement he seeks is proper." *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 276 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 248 (3d Cir. 1999)).   "A private placement is 'proper' if it (1) is 'appropriate,' i.e., it provides 'significant learning' and confers 'meaningful benefit,' and (2) is provided in the least restrictive educational environment." *Id.* (quoting *Ridgewood*, 172 F.3d at 248).   "What constitutes a 'benefit' depends on the child's potential." *H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 70 (3d Cir. 2015) (citing *Ridgewood*, 172 F.3d at 247-49, n.8).

The ALJ made several factual findings regarding SEARCH's services and R.S.'s development, which the Court now restates. "SEARCH is a center-based program that provides one-to-one behavior analytic services to children with autism."   ALJ Decision at 5.   Following a preliminary observation of R.S. by its staff, SEARCH "recommended a full-time behavior analytic program for thirty hours per week with intensive one-to-one instruction and parent training."   *Id.* at 6.   Beginning on April 6, 2016, a Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP) was administered to R.S.   *Id.*   The results of that assessment "reflect[ed] that R.S.'s skill levels were all within the zero-to-eighteen months age range, but R.S. was twenty-nine months old at the time."   *Id.*   R.S. formally started at SEARCH on April 18, 2016, where he received therapy in accordance with the prior recommendation.   *Id.*

SEARCH subsequently prepared "Goals and Objectives" for R.S. that were focused "primarily on foundational skills," such as "decision making and problem-solving," "health-enhancing behaviors," and communication.   *Id.* at 7-8.   Pursuant to a Progress Report dated August 11, 2016, "[t]he target responses for 'education programs' were," among other things, "making eye contact, looking in response to name . . . following basic directions, gross motor imitation, motor imitation with objects, verbal imitation of words, . . . receptive labeling of body parts, . . . and responding to a greeting."   *Id.* at 8-9.   A second VB-MAPP was administered in

16

September 2019.  *Id.* at 9.  R.S. demonstrated progress in seventeen of the twenty-four assessed areas, and his score increased from 23 to 58.5.  *Id.* at 10.

The ALJ heard testimony from SEARCH's founder Carrie Kahana; Nicole Journe, a SEARCH behaviorist; and Carol Fiorile, a doctoral-level behaviorist; among others.  As summarized by the ALJ, Kahana testified that ABA "is the only evidence-based method for educating children with autism," and that "[t]he earlier, the more intense, higher quality the intervention, the better the outcome."  *Id.* at 21.  Kahana further attested that "R.S.'s improvement on the VB MAPP was meaningful improvement for him because he previously had no imitation or social skills."  *Id.*  As for the qualifications of SEARCH and its staff, Kahana testified that

> SEARCH has ongoing staff evaluation, with all staff evaluated minimally once per quarter.  SEARCH conducts an inter-observer agreement to make sure what is being taught and that the data collected is accurate.  The staff has different training levels, but all the instructional staff who provide one-to-one direct instruction work alongside a [Board Certified Behavior Analyst ("BCBA")] at least five hours per week while in session with their assigned students.  They have monthly lecture-based staff trainings and weekly mini meetings on autism and ABA topics.  They have five in-service days through[out] the year; experts in different areas provide training to staff.  The minimum staff educational requirement is a bachelor's degree, but all of SEARCH's instructional staff are registered behavior technicians (RBT), (RBT) Board Certified Assistant Behavior Assistants (BCaBA), BCBAs or are in pursuit thereof.  An RBT has a minimum of a high school degree.  There is a forty-hour training module that must be completed; and a competency assessment completed with oversight by a BCBA and an exam through the Behavior Analyst Certification Board (BACB) to earn this title.

*Id.*

Journe testified that "R.S. had no group learning" at SEARCH "because he requires one-to-one instruction based on data and rate of skill acquisition."  *Id.* at 25.  She averred that group learning was not appropriate for R.S. because it already was difficult enough for him to master

different tasks in the one-on-one setting.   *Id.*   She opined, for example, that "[p]rior to having the skill set to even respond to his name, group learning would not be possible."   *Id.*   Fiorile similarly testified that R.S. requires one-to-one instruction.   *Id.* at 38.   She attested that R.S. "presently requires intensity to learn foundational and prerequisite skills and to be able to learn in groups." *Id.* at 39.   Fiorile asserted that R.S. "is learning at a rapid rate and with intensive instruction he might ultimately be able to return to the District in a general education classroom."   *Id.*   She further noted that, "[d]espite not receiving occupational therapy from an occupational therapist, [R.S.] has progressed in his fine motor skills at SEARCH."   *Id.*

The ALJ found that "[t]he credible testimony and the documentation from SEARCH reflect that SEARCH's ABA program was appropriate for R.S. and allowed him to make meaningful educational progress."   *Id.* at 49.   Giving "due weight" to the ALJ's findings, *Ridley*, 680 F.3d at 268, the Court is satisfied that there are no grounds to set aside the ALJ's conclusion.   Plaintiff has not identified any specific deficiencies with respect to R.S.'s placement at SEARCH beyond its claim that non-school placements are *per se* improper.

## 2.  The Discretionary Reduction or Denial of Reimbursement is not Warranted.

Plaintiff also submits that "the ALJ erred by failing to reduce or deny the reimbursement because the parents failed to provide requisite notice of their concerns and intent to enroll R.S. in a private placement."   Pl.'s Moving Br. at 18.   It contends that Defendants failed to voice their concerns at the November 1, 2016, IEP meeting and state their intent to continue R.S.'s enrollment at SEARCH.   *See id.* at 20-24.   Plaintiff also contends that Defendants' unreasonable course of conduct warrants a reduction or elimination of any reimbursement.   *Id.* at 26-29.   Although the ALJ concluded that "it was reasonable for [Defendants] to unilaterally place R.S. at SEARCH for the 2016-2017 school year," ALJ Decision at 49, the ALJ did not explicitly address or dispose of

Plaintiff's notice argument.   The ALJ nonetheless made sufficient findings for this Court to lay out the facts bearing on this issue.

On the advice of R.S.'s pediatrician, Defendants contacted New Jersey Early Intervention System ("NJ EIS") for evaluation when he was about eighteen months old.   *See id.* at 3.   NJ EIS recommended services at that time.   *Id.*   In conjunction with the autism diagnosis in March 2016, R.S.'s neurodevelopmental pediatrician issued a referral recommending "One on One ABA 35 hours per week with the supervision and programming performed by a Board Certified [BCBA]." *Id.* at 5 (internal quotation marks omitted).   Defendants thereafter sought ABA services and eventually "signed an Agreement for Service with SEARCH through April 5, 2017."   *Id.* at 6. Although the Agreement was for a one-year term, "it could be terminated by the parents on forty-five days' notice."   *Id.*

On or about July 11, 2016, NJ EIS notified Plaintiff that R.S. was approaching three years of age and may be eligible for services.   *Id.* at 8.   Dawn McNichol, a school psychologist employed by Plaintiff, was assigned to be R.S.'s case manager and contacted the parents to schedule "an identification and evaluation planning meeting for September."   *Id.*   That meeting took place on September 14, 2016.   *Id.* at 9.

> At the meeting, Mom advised that R.S. had been diagnosed and was attending SEARCH.   No request was made that the parents provide the District with written documentation of his autism diagnosis. Mom advised the meeting participants that she was concerned about language, self-help and adaptive skills, and repetitive behaviors.

*Id.*   Plaintiff determined that evaluations were warranted.   The next day, "McNichol advised Mom via email that she had contacted SEARCH on September 14, 2016 and left a message for Kahana to call back to schedule an observation and evaluation."   *Id.*

> In response to the District's request, SEARCH advised the District that its personnel would be allowed to observe R.S. at SEARCH but would not be allowed to evaluate R.S. at SEARCH.   Kahana did

> not allow the evaluations at SEARCH because of space considerations and because she felt it was important to evaluate R.S. in a non-conditioned setting, as R.S. had learned what the expectations were at SEARCH and what he was and was not allowed to do, so the District would not have obtained a pure baseline assessment.

*Id.*

On September 24 and September 25, 2016, speech therapists and an occupational therapist employed by Plaintiff evaluated R.S. at his home.  *See id.* at 10-11.  On September 27, 2016, McNichol and a speech therapist observed R.S. at SEARCH.  McNichol and the therapists then prepared a "Collaborative Preschool Evaluation," which included their respective evaluation results, observations from SEARCH, and preliminary recommendations.  *See id.* at 11-13.  On October 21, 2016, Plaintiff invited Defendants to the IEP meeting.  *Id.* at 13.  A few days later, D.S. responded to confirm the date of the meeting and to inquire regarding the agenda.  *See id.* at 13-14.  "McNichol responded that it would be the eligibility and IEP meeting, and that they would review the Collaborative Preschool Evaluation and develop an appropriate IEP so that R.S. could begin a program on his third birthday."  *Id.* at 14.  Plaintiff provided Defendants a copy of the Collaborative Preschool Evaluation to the IEP meeting.  *Id.*

D.S. attended the IEP meeting while S.S. participated via phone for some of the meeting.  *Id.*  The meeting was recorded.  *Id.* at 16.  D.S. received a copy of the draft IEP, which recommended a "Special Class Preschool Disabilities Full-Day (preschool disabled program)."  *Id.* at 14-15.  "At the meeting, it was explained that initially information is obtained from the District's evaluations, and parental and SEARCH input, but it was not uncommon after 30-45 days to tweak goals and objectives or programming options after an opportunity to work with the student."  *Id.* at 16.  "District personnel also stated that the goals are a work in progress; that if there was anything that is a priority to the parents it could be included in the goals; and that the

IEP is a fluid document and not set in stone if R.S. masters goals more quickly." *Id.* The instructor of the preschool disabled program gave an overview of the program. *See id.* at 17.

D.S. asked about the qualifications of the teaching aides for the preschool disabled program, as well as about how student progress was to be measured and tracked. *See id.* After her concerns were addressed, "Mom had no additional questions at that time and stated that it was a lot of information." *Id.* at 18. She was also advised that "she was welcome to observe the program." *Id.* Defendants obliged the latter request, and jointly observed the program on November 4, 2016. *Id.*

On November 15, 2016, three days prior to R.S.'s third birthday and anticipated start date in Plaintiff's preschool disabled program, defense counsel provided Plaintiff notice of Defendants' intention to continue R.S.'s placement at SEARCH. *See id.* Defense counsel stated "[t]he parents have concerns in regard to the District's proposed program and would like to have Carrie Kahana, BCBA, and Dr. David Sidener, BDCA-D, observe the proposed program on separate dates." Cert. of Beth A. Callahan, Ex. A, June 24, 2020, D.E. 28-2. Defense counsel further stated that, "[i]n addition, please be advised that the parents are continuing R.S.'s placement at [SEARCH] . . . and this letter should be accepted as a unilateral placement in accordance with N.J.A.C. 6A:14-2.10." *Id.*

As recounted by the ALJ, D.S. credibly testified at the due process hearing as follows:

> She shared information with the district, attended the meetings, and consented to all documentation with the District. SEARCH had all the important documentation and the parents authorized SEARCH to share it with the District. She also consented to evaluations of R.S. by the District.
>
> [. . .]
>
> Mom attended the IEP meeting, and Dad participated for some of the meeting by phone. Mom was two-months post-partum, and very overwhelmed by all the deficiencies noted in the

multidisciplinary evaluations.   The District recommended its preschool disabled program, but this concerned her because R.S. had been at SEARCH for six months, with intensive one-to-one ABA therapy. . . . [The preschool disabled program instructor] advised during the IEP meeting that the preschool disabled program had a small student-teacher ratio, but she did not advise that it would be one-to-one, or that it was an ABA program . . . .Mom did not know her role, as she had never been to an IEP meeting before.   She also had not yet seen the District program and did not know if at that point she was supposed to be critiquing the program.

Mom observed the District program, and saw children working in small groups.   She saw [the instructor] working with two children. When she was working with one child, the other child would take a break on the carpet.   Mom was disappointed by this because she knew if R.S. was allowed to take a break on the carpet, he would be engaging in non-contextual vocalizations, self-stimulatory behavior, and repetitive behaviors, like opening and closing doors or cabinets.

The parents met with [the BCBA for preschool disabled program] for forty minutes and Mom asked a lot of questions.   She believed the because [the behaviorist] was a BCBA, she knew a lot about autism.   However, Mom observed the aides in the classroom and after having six months of parent training at SEARCH, she could see that the aides did not have instructional control over the students. . . .   After observing, Mom had a very low confidence level in the aide and [the instructor]. . . .   [Mom] was not asked what she thought of the program or if she had any concerns.

*Id.* at 40-41.

"Parents who believe that a public school is not providing a FAPE may unilaterally remove their disabled child from that school, place him or her in another school, and seek tuition reimbursement for the cost of the alternate placement."   *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 242 (3d Cir. 2009). "[P]arents who unilaterally change their child's placement," however, "without the consent of state or local school officials, do so at their own financial risk." *Burlington*, 471 U.S. at 373–74.   "The IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations."   *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010).   "Even where

22

a District is found to be in violation of the IDEA and private school placement is deemed appropriate, 'courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant.'" *Id.* at 71 (quoting *Forest Grove*, 557 U.S. at 246-47).

"The IDEA directs that an award of private school tuition 'may be reduced or denied' under a variety of circumstances, including 'upon a judicial finding of unreasonableness with respect to actions taken by the parents.'" *Id.* (quoting 20 U.S.C. § 1412(a)(10)(C)(iii)(III)). Two other enumerated grounds for reduction or denial of reimbursement concern notice:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>
> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa)[.]

20 U.S.C. § 1412(a)(10)(C)(iii)(I). "The notice requirement exists 'to give the school district an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate IEP, and demonstrate whether or not a FAPE can be provided in the public schools.'" *H.L. o/b/o V.L. v. Marlboro Twp. Bd. of Educ.*, No. 16-9324, 2017 WL 5463347, at *7 (D.N.J. Nov. 14, 2017) (quoting *T.H. ex rel. A.H. v. Clinton Twp. Bd. of Educ.*, No. 05–3709, 2006 WL 1128713, at *6 (D.N.J. Apr. 25, 2006)).

Noncompliance with those provisions is not a *per se* bar to reimbursement, as the statute's permissive language so indicates. *See* 20 U.S.C. § 1412(a)(10)(C)(iii). "It is well-settled that . . . the reviewing judge retains '*discretion* to reduce the amount of a reimbursement award if the equities so warrant,' including for failure to 'give the school district adequate notice of their intent

23

to enroll the child in private school.'"   *H.L.*, 2017 WL 5463347, at *8 (quoting *Forest Grove*, 557 U.S. at 247) (emphasis in original).

Here, Defendants "did not inform the IEP Team that they were rejecting the placement proposed" at the November 1, 2016, IEP meeting.   20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa).   Nor did Defendants "stat[e] their concerns and their intent to enroll their child in a private school at the public expense" on that date.   *Id.*   As for the November 15, 2016, letter purporting to comply with the analogous state regulation, that letter did not come "10 business days . . . prior to the removal of the child from the public school."   20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).   Rather, it came three days prior to R.S.'s intended enrollment date in the preschool disabled program.

Those technical violations notwithstanding, the Court finds that Plaintiff had an adequate opportunity to assemble its IEP team and evaluate R.S. in order to develop an appropriate IEP prior to his third birthday.   Indeed, Plaintiff was well-aware of R.S.'s enrollment at SEARCH, as well as his progress at that institution and the nature of the services being provided.   *See* ALJ Decision at 9 (noting that D.S. advised Plaintiff at the initial identification and evaluation planning meeting that R.S. had been diagnosed with autism, and that McNichol had contacted SEARCH herself shortly thereafter); *id.* at 13 (noting that Plaintiff's occupational therapist had a telephone conference with SEARCH on October 19, 2016, during which time "SEARCH shared the various programs they were working on with R.S.").

From the outset of the collaborative process between the parties in forming the IEP, Defendants consented to sharing all documentation with Plaintiff.   *See id.* at 14 (noting that Plaintiff had various documents from SEARCH in its possession prior to the IEP meeting); *id.* at 28 (recounting McNichol's testimony that "[n]o one was denied access to R.S. or his program at SEARCH, and parents never objected to sharing information or allowing the district to observe him at any location").   Defendants thereafter attended the IEP meeting, subsequently observed

24

the District's program, and questioned the BCBA at length during the observation.  *See id.* at 41 (recounting Mom's testimony that she was disappointed following her observation of the preschool disabled program and "asked a lot of questions" during her meeting with the BCBA).

Given that Defendants' observation of the preschool disabled program occurred on November 4, 2016, Defendants would have had to provide written notice on that date in order to comply with the ten-business-day period prescribed by the regulation.   With respect to objecting to proposed IEP at the IEP meeting itself, the Court finds that Defendants did not act unreasonably by failing to declare their intent to continue the enrollment at SEARCH at that time, given that they had not yet observed the program.   Nothing in the record indicates that Defendants prejudged Plaintiff's proposed IEP, or that their cooperation with Plaintiff up until the unilateral placement letter was a mere formality in order to obtain reimbursement.   The Court does not draw any negative inferences from Defendants' decision to promptly seek private therapy for R.S. following his diagnosis and prior to those service being made available by Plaintiff, given the credible testimony that "[t]he earlier, the more intense, higher quality the intervention, the better the outcome."   ALJ Decision at 21 (recounting Kahana's testimony).

In the Court's view, this case is a far cry from the wrong that the notice provisions seek to prevent: parents simultaneously withdrawing their child without prior notice to the district or the opportunity to develop an IEP, along with the delivery of a significant bill to be picked up by the district for the private placement.   Here, it would have been preferable for Defendants to have had the opportunity to observe the preschool disabled program and thereafter have met with Plaintiff to discuss any concerns that remained. The Court nonetheless concludes that Defendants satisfactorily engaged in the required dialogue and collaborative process with Plaintiff prior to making their decision to continue R.S.'s placement at SEARCH in the short window of time between the date of the observation of the preschool disabled program and his start date in that

program.   Accordingly, this Court declines to exercise its discretion to reduce the reimbursement award issued by the ALJ.

*       *       *

For the foregoing reasons, the Court finds by a preponderance of the evidence that SEARCH is a reimbursable placement and there is no basis from the record to reduce the amount of the reimbursement award.   The Court denies Plaintiff's Motion for Summary Judgment. Defendants' Motion for Summary Judgment is granted.

### 3.   Defendants are Entitled to Reasonable Attorneys' Fees

The IDEA prescribes that, "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability[.]"   20 U.S.C. § 1415(i)(3)(B)(i)(I).   Prevailing parties are those that "'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"   *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ*., 287 F.3d 267, 271 (3d Cir. 2002) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).   "Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."   20 U.S.C. § 1412(i)(3)(C).

"The party seeking attorneys' fees has the burden of proving that the requested fees are reasonable."   *Jackson Hewitt Inc. v. Nat'l Tax Network, LLC*, No. 10-5912, 2015 WL 5770089, at *4 (D.N.J. Sept. 29, 2015).   "The starting point for determining any reasonable fee is to calculate a 'lodestar' amount; that is, the number of hours reasonably expended multiplied by a reasonable hourly rate."   *Blakey v. Cont'l Airlines, Inc.*, 2 F. Supp. 2d 598, 602 (D.N.J. 1998). Once determined, the lodestar is presumed to be the reasonable fee.   *See Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).   The Court may then, in its discretion, adjust the lodestar to

26

account for the degree of success achieved.   *See I.K. v. Montclair Bd. of Educ.*, No. 16-9152, 2019 WL 5344550, at *3 (D.N.J. Aug. 28, 2019).

"Although courts have considerable discretion to award fees, courts cannot decrease fee awards 'based on factors not raised at all by the adverse party.'"   *Goh v. Coco Asian Cuisine, Inc.*, No. 15-6310, 2019 WL 5328857, at *2 (D.N.J. Sept. 27, 2019) (quoting *J&J Snack Foods, Corp. v. Earthgrains Co.*, No. 00-6230, 2003 WL 21051711, at *6 (D.N.J. May 9, 2003)), *report and recommendation adopted*, 2019 WL 5309441 (D.N.J. Oct. 18, 2019).   Downward adjustments must be based on "direct and specific objections by opposing counsel."   *Red Roof Franchising LLC, Inc. v. AA Hosp. Northshore LLC*, 937 F. Supp. 2d 537, 563-64 (D.N.J. 2013) (collecting cases), *aff'd sub nom. Red Roof Franchising LLC v. Patel*, 564 F. App'x 685 (3d Cir. 2014).

Defendants' due process petition sought to continue their unilateral placement of R.S. at SEARCH and for reimbursement of all costs associated therewith.   *See* ALJ Decision at 2.   The ALJ granted said relief, ordering that Plaintiff "reimburse [Defendants] for the costs associated with R.S.'s placement at SEARCH, including tuition and transportation, for the 2016-2017 school year, beginning on November 18, 2016."   *Id.* at 54.   Plaintiff filed this civil action seeking a reversal of the ALJ' s reimbursement award, as well as stay of the ALJ's decision in light of interim enforcement efforts instituted by the New Jersey Department of Education.   Defendants have now prevailed before this Court as the ALJ's decision has been affirmed in all respects.   Accordingly, the Court concludes that Defendants are prevailing parties within the meaning of the IDEA.

In its opposition to the fee application, Plaintiff does not contest the reasonableness of the rates submitted by defense counsel or the number of hours expended.   Rather, Plaintiff submits that "it would be both premature and unjust to consider Defendants a prevailing party in this matter when it is still possible for them to lose the present appeal."   Pl.'s Opp'n Br. at 35.   That argument is unavailing.   *See Dumont Bd. of Educ. v. J.T. o/b/o I.T.*, No. 09-5048, 2010 WL 11566519, at

27

*1 (D.N.J. July 15, 2010) ("The right to attorneys' fees does not depend on the exhaustion of all appeals.").

Defendants seek a total of $159,367.24 in legal fees expended at the administrative level. *See* Cert. of Beth A. Callahan ¶ 36, June 24, 2020, D.E. 28-1.   That figure corresponds to 541.5 hours at hourly rates of $400 for partner-level work, $200 for associate-level work, and $100 for paralegal-level work.   *See id.* ¶¶ 23-32.   With respect to fees incurred in the instant matter following the ALJ's decision, Defendants seek $24,730 for 110.8 hours of legal work performed.

The Court concludes that the hourly rates are reasonable.   *See Qureshi v. OPS 9, LLC*, No. 14-1806, 2020 WL 1910344, at *3 (D.N.J. Apr. 20, 2020) ("Prevailing market rates in the legal community usually set the reasonable hourly rate."); Cert. of Staci J. Greenwald, Esq. ¶ 8, June 24, 2020, D.E. 28-4 (stating that $400 hourly rate "is a customary charged by other attorneys who specialize in this area and who practice in the community in which this matter arose, and is reasonable in light of [defense counsel's] level of expertise and years in practice"); Cert. of Paul N. Barger, Esq. ¶ 6, June 24, 2020, D.E. 28-4 (same).   "The court must award fees at the requested hourly rate where, as here, the non-movant submits no contradictory evidence."   *Qureshi*, 2020 WL 1910344, at *3; *see also Goh*, 2019 WL 5328857, at *3 (approving requested hourly rates when the defendants had not "submitted any affidavits or other evidence contesting Plaintiff's counsel's prima facie showing"), *report and recommendation adopted*, 2019 WL 5309441 (D.N.J. Oct. 18, 2019).   As for the time spent working on this case, the Court has carefully reviewed the supporting documentation and finds that the legal work on this case was not excessive, duplicative, or unreasonable.   *See Qureshi*, 2020 WL 1910344, at *4 ("A court may reject fees for any hours that are 'excessive, redundant, or otherwise unnecessary.'" (quoting *Blakey*, 2 F. Supp. 2d at 604)).   As noted above, Plaintiff has not contested the hours expended on this matter.   Accordingly, the Court will award Defendants their requested fee award.

**IV.    CONCLUSION**

For the reasons set forth above, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.   An appropriate Order will follow.

*/s Michael A. Hammer*
**UNITED STATES MAGISTRATE JUDGE**

Date: September 4, 2020